Good morning, your honors. My name is Georgia McMillan. I represent the defendant appellant John Mendoza. My client, Mr. Mendoza, was convicted on various fraud charges related to a mortgage, an alleged mortgage fraud scheme. On appeal this morning, I would like to focus on the aspect of sentencing going to restitution. It is our position that... Are you appealing just the sentence? You're also appealing the conviction. We're appealing the conviction as well, Judge Scanlon. But I would like to focus this morning on the issue of restitution. Our position is that one of the former homeowners, Socorro Kovach, was not a victim with respect to the property located in Kailua, which is referred to as the Mokapu property in the record. There are two properties involved in this case. One is referred to as the Mokapu property, and the other is referred to as the 16th Avenue property or the Kaimuki property. Can I ask you on that point? It's my understanding that Mr. Mendoza maintained an equitable interest in the home because Beneficial of Hawaii had the practice of refunding to the foreclosed-upon homeowner any monies the company received in excess of the amount owed to them. Is that correct? That is not our position, I would say. That's incorrect, Judge. Is that a correct statement of fact? That is an incorrect statement of fact, Judge Smith. And wherein is that wrong? Beneficial did not have, as a standard operating procedure, to return the deposit to someone who no longer had any equitable interest in the home, which was Mrs. Kovach. Indeed, Your Honor, if we look at the record, and I'm turning to the second volume of the excerpts of record, this is the testimony that I focus on in the opening brief with respect to the realtor, Georgia Roberson. And she talks about this issue of what were Mrs. Kovach's equitable interests or legal interests, any interests whatsoever in this property. And she points out, if we look at page 168 and 169 of the record, she states that Beneficial decided how much they wanted this person to pay for the house, not Mrs. Kovach. She also states on page 168 that after Mrs. Kovach had lost the home to foreclosure, she waited for a number from Beneficial Hawaii. That was the seller-owner at that point. She says, we had to wait for numbers set by Beneficial. Okay, let's say that's all true. That still reiterates the fact that it was their practice to pay any excess monies to the beneficial interest holder, right? I say no. I say no, Judge Smith. I thought you were saying it was just a question of the amount that Beneficial elected to pay. Did I misunderstand? No. No, and I disagree with that statement, Judge Smith, that Beneficial had as a standard operating policy to provide this amount to someone who no longer had any legal interest in this property. Let's go to a different point. As I understand it, in Supplemental Act, it's a record 101 to 103, that Beneficial delivered Kovach a check in the amount of $49,063. She then went to the bank with Mendoza, obtained a check from Mendoza in the amount of $28,304, in quotes, investment, for the straw purchaser in the amount of $5,000, and for another creditor in the amount of $5,100. So Mendoza repaid her only $3,000 of that sum. Obviously, there's a delta there. Why is she not a victim, at least as to the amount of money that represents the delta in that sum? Before answering your question, Judge Smith, I'm not sure what you mean by the delta. The difference. Oh, the difference. Okay, I'm sorry. She's not a victim because she had no right to the $49,000 to begin with, and our position is that that was simply a windfall. The real estate broker, Georgia Roberson, said that her receipt of the $49,000 was extremely rare. She said that she had never seen it happen before. But that's not the question. The question is, was she a victim when she loaned money to your client and he never repaid it as part and parcel of the scheme to the fraud? Without regard to whether or not she had an equitable or legal interest in the property. Our position is that she's not a victim for that loan. That was up to her to provide that loan. So the fact that she loaned him money as part of the scheme to the fraud that he never repaid doesn't make her a victim? That's a pretty radical statement of the law of fraud, isn't it, under the Mandatory Victim Witness Protection Act? Well, to answer your question, Judge Tallman, we do not concede any of the convictions. So we do not see that there was the mortgage fraud involved. Let's assume for purposes of my hypothetical that I must review the record in the light most favorable to upholding the jury's verdict, which is the standard I must apply. So I'm going to assume for purposes of my hypothetical that he was, in fact, engaged in a scheme to the fraud. And, in fact, I have an expressed factual finding on restitution by District Judge Seabright that but for Mr. Mendoza's fraudulent activities, Ms. Kovach would not have been out the money that she loaned to him. Why doesn't that make her a classic victim under the Mandatory Victim Witness Protection Act? Our position is it was her choice. She wasn't entitled to those monies. Those monies didn't come to her by way of the fraud scheme. I've got the same problem with you that I had with counsel in the earlier case. You've got to convince us that that factual finding was clearly erroneous by the trial judge who heard, was it eight days of testimony here? Eight days of testimony, yes, Judge Tallman. So what evidence are you going to offer to me to convince me that that factual finding is clearly erroneous? The factual finding with respect to her victimhood or the restitution? The finding, as I understood it, was but for Mr. Mendoza's fraudulent activities, Ms. Kovach would not be out the money. In fact, not only the money that she loaned him, but he also found that she would have received the difference had beneficial, or excuse me, had the original lender simply foreclosed on the property under Hawaii law, she would have received the difference pursuant to the Hawaii statute of the delta, as Judge Smith puts it so accurately, between what the lender actually recovered less the amount of the loan outstanding and any cost incident to foreclosure. Okay, Judge Tallman. I'll work my way backwards in your questions. Okay. With respect to her receiving any amount from the lender after she had lost the property, our position is that she had no legal interest in receiving anything after that. The record is clear that she may have been in possession of the property, she still resided there, but she no longer had a legal interest in the property. And so we reject Judge Seabright's finding that she had some form of legal interest in the property. But counsel, with respect, Judge Tallman's made it very clear. Judge Seabright heard eight days of testimony. He made some findings, and it's your burden. We can't just make this up. We've got to look at the record, and we've got what he found. We have a lady who owns some property. Somebody came to her who at least has been convicted of being a con man, basically. What I'm understanding you to say is that notwithstanding that and the further details that Judge Tallman provided, that because she did not have a technical legal right from your perspective, that she wasn't a victim. How do we get around the point that each of these factual findings that Judge Seabright made is binding on us and something to the contrary to show that he was clearly wrong here? What can you bring to us that helps us get past that hurdle? Well, there's two factual findings I think the court is focusing on. First is the victim status, and next is the restitution amount. Okay, I'll start with the victim status. That's what we've been talking about here. Our position, and to quote the court on the first case, this is our best shot, by the way, is that by October 2003, she still resided on the property. She was in possession of the Mokapu property. However, she had no legal interest in it. But she didn't have a legal interest because she was conned out of it by this client of yours, isn't that correct? No, that's incorrect. By October 2003, I don't believe she had met my client at that point. My client doesn't come into the record with respect to that property until January 2004 when he expresses an interest in purchasing it. Did he have someone else contact her as an agent? The allegation is that a mortgage broker at a brokerage firm called Mortgage Ability connected them together. And that's one with which your client had worked regularly, is that correct? Not my client, Your Honor. It was one of the co-defendants, Paula Galakdak. Counselor, can I take you back to the statute in front of you? Maybe it would help. A statute? A statute, 18 U.S.C. section 3663A, the mandatory insurance. I do, if I could step away for a moment. I think it would be helpful so you can follow my question. Just bear with me for a moment. Go ahead. Just let me know when you've got it. All right, Judge Tallman, I'm ready. Are you with me? Okay. And I'm referring specifically to subparagraph A-2, the definition of a victim. As I understand Judge Seabright's factual finding, he was trying to determine whether Ms. Kovach was a victim, meaning a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including in the case of an offense that involves as an element a scheme, which is what we have here, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern, end quote. That doesn't say anything about whether or not she had a legal interest or an equitable interest. It simply requires a determination by the court as to whether or not she was directly and proximately harmed by the criminal behavior, and that's why I'm having a hard time following your argument in the face of the district court's express finding of fact that she was directly and proximately harmed. Or in the district court's words, but for Mr. Mendoza's behavior, she would never have lost the money. Well, I see your point, Judge Tallman. Our argument is that she had no legal interest in the property. She was not directly harmed by my client's behavior, and she's not entitled to this restitution amount. If she was harmed with money as the direct result of a defendant's scheme to defraud, and he doesn't pay it back, how is that not direct harm from the commission of the crime? And that's what I understand Judge Seabright to have found after listening to eight days of testimony. Well, Your Honor, this is our best shot, and I would like to move on. I'm with you. All right. I used to be a criminal defense lawyer, too. I know what it's like. If I may, I would like to move on to the restitution amount, if I may. We also think Judge Seabright erred with respect to the restitution amount. And there, our argument has to do with whether this, focusing on this property again, the Mokapu property, whether it should have been valued at $535,000 or $400,000. We choose the $400,000 benchmark in order to begin making deductions for this restitution amount. We choose the $400,000 benchmark because the record supports it. I return now to the real estate broker's testimony on page 168 and 169 of the record, which clearly indicates that Beneficial, the owner now of this property, not Kovach, Beneficial owned this property and Beneficial chose this number, $400,000, not my client. And so Ms. Roberson states, quote, Beneficial decided how much they wanted this person to pay for this house, end quote. This is on page 168. She also testified, quote, We had to wait for the numbers to be set aside by Beneficial. And later, quote, Beneficial got their numbers together. They had an appraiser go in and appraise the house. They used my values and their values before they set the price. And then I think it was January of 2004 that Beneficial gave me the number, close quote. Judge Seabright consistently states in the two sentencing, actually not in the first sentencing hearing, pardon me, in the second sentencing hearing, that my client somehow set the value for this property. But Ms. Roberson consistently testifies that it was Beneficial. And then on the same page, and this is key as to what the number was that Beneficial said on page 168, she says it was, quote, 400,000, take it or leave it, close quote. So at sentencing, when Judge Seabright insists that the numbers by which restitution would be set for this property was 335,000, we think that the record does not support this. I don't mean to sound like a broken record. I think you would have a wonderful argument if the record showed that it was somebody other than Mr. Mendoza, who was the repurchaser of the property. If this were truly an arm's length transaction between an otherwise willing seller, Beneficial trying to get rid of a property that they had had to foreclose on, and a completely uninvolved person, and 400,000 was all the market would bear, I think you'd have a much better argument. But I go back to that factual finding that but for Mr. Mendoza's behavior, and that this activity was in furtherance of the scheme to defraud, that $400,000 figure in the district court's view is not the fair market value of the property, that it was appraised at 535,000, and that in a, I guess, perfect economic world, the bank would have received something close to 535,000 when they resold it. Now, they might have discounted it somewhat, but this is not an exact science, and we review it for abuse of discretion. What's your response to that? However, Judge Tallman, the number 400,000 was determined by Beneficial in January 2004. The appraisal for the 535, the record indicates did not occur until April 2004. Moreover, testimony of Georgia Groberson consistently states that this number was, the 400,000, which we think is the correct number, was come up by Beneficial independent of my client. And this is why I'm reading from the record. She said that they said 400,000, take it or leave it. Furthermore, Your Honor, I'd just like to point out there was testimony by both a percipient witness and an expert witness, Patricia Lindsey. She testified with respect to lending practices during this time, but as well to this particular transaction. And she states on page 65 of the record, she says that ultimately the lender in this case was New Century. She says that in this case the appraised value, she's referring to the April 2004 appraised value was 535,000, but the purchase price was 400,000. And then she states, quote, it was our policy to always go with the lower of the two, regardless of what the appraised value was, end quote. That's on page 65 of the record. Can I switch you over, since we don't have a whole lot of time left, and this might be one that would actually help your client. It appears that the district court perhaps violated Apprendi when he classified the accounts as Class B, based upon 3559A offenses, when they should have been classified as Class C. By my reckoning, and I think the government conceded this, the district court should have only sentenced your client to a supervised release term of three years as opposed to five. Is that your understanding? That is my understanding, and we agree with the government's position. Okay, but now we have this problem. The 1014 counts still carry a supervised release term of five years. So if we send this back to the district court, aren't we just going to be doing a little loop-de-loop and we're right back with the five years of supervised release? Does that make any sense for us to do that? It does make sense, Your Honor, because the loop-de-loop is on Judge Seabright's part. That's a legal term, by the way. I like that term, Your Honor. It's up to the sentencing judge to make these decisions. This is a complex case. It involved more than 20 counts of conviction, and I agree with the government that it does need to be remanded with respect to that. Let's look at it from a practical standpoint. The district court imposed a supervised release term of five years on the false statements to a financial institution, completely separate and apart from the other issue. The loop-de-loop that Judge Smith is talking about is, why do we have any reason to think that the district court will not impose the same term of five years of supervised release on the counts of conviction that don't have anything to do with the error that you're talking about here? So he's going to get exactly the same sentence on remand. And my further practical point is I assume your client is now in an institution somewhere on the mainland serving his sentence. He's here, Your Honor. He's here? He's in an institution here. Okay. And my experience in handling these matters before is when we jerk these people out of the institutions that they're in, they sometimes lose the position that they might have waited several months to get to, like a favorable job or something. Maybe that's not a concern since he's still on the island, that he could be brought to court and resentenced on it. But I guess my concern remains, what's the point of doing this if he's still going to get a five-year term of supervision? I think the issue is will he, though, Your Honor. It seems I think the government's position is well taken. I think that the matter of the length of probation would need to be reanalyzed. But the error you're talking about doesn't have anything to do with the counts on which a five-year term of supervised release was appropriately ordered. I mean, this whole issue just seems to me to be something that lawyers and judges would get excited about. But in the practical world of criminal sentencing, he's going to get the same sentence of five years of supervised release on the other counts that there's no legal error. So why should we notice the error? That's my question. Well. What practical benefit would it have to your client if we were to send it back? I guess my question would be, Judge O'Scanlan, are we certain that it would have no effect? I'm not clear that we are at this point. Well, we're at least certain that the other offense would be reduced from a five-year supervised release to three years. But there's nothing to suggest that any of the other counts wouldn't remain the same, is there? I mean, frankly, we could remand it for the limited purpose of resentencing on these counts alone. As well as restitution. But the net result is – well, assuming you lose on the restitution argument. Let's just look at sentencing on this issue. The result would be that the five-year term of supervised release would stand, because you're not challenging the five years of supervised release on the other counts of conviction. No, we can't. Okay. Because it involves the financial institution. All right. Thank you, Counselor. Your time has expired. Thank you. You'll hear from the government now. Good morning. May it please the Court. I'm Larry Tong, Assistant United States Attorney here in the District of Hawaii, arguing for the government. I'll start with the issue on which we conceded error. We did agree in our brief that there was apprendee error as to the imposition of the five-year term of supervised release as to the mail fraud and wire fraud counts, where the jury was not asked to find nor did it find that the offenses affected a financial institution. I agree that it is a bit of a loop-a-dee-loop, to use Your Honor's phrase, and I know the court and certainly the district court and even us as prosecutors don't like to engage in useless exercises. But there is an error there. I agree that if the court would have been. What's the consequence of the error as you see it? You know, as a practical matter, I see no consequence whatsoever, other than the court committed a mistake there that neither the parties nor the probation office noted. Judge Seabright is a very, very careful judge. I know I'm telling you folks what you already know. I had the pleasure of working with him for about 20 years in our office. I have great respect for how careful he is about everything, as reflected by how he dealt with a very complicated restitution issue. But on this one, everybody missed that one technical point. So why shouldn't we invoke Federal Rule of Criminal Procedure 52A and find the error harmless? And under the plain error rule, since there was no contemporaneous objection at sentencing, determine that it would not adversely affect the public reputation of the federal court proceedings because any member of the public would say, why are we wasting our time and precious taxpayer money on a resentencing on these counts? You know, I would agree, Your Honor. I think it fails under the last prong of the plain error test because, as you just stated very cogently. And as a practical matter, the sentence is not going to be affected in any way because the defendant has not challenged anything having to do with the guideline calculations, other than the base offense level, which, as we pointed out in our brief, would be a seven, regardless of whether you use the 20-year statutory max or the 30-year statutory max, which was mistakenly used. The defendant nor has she challenged any of the computations relative to the amount of the loss, the enhancements for organizer, the enhancement for a vulnerable victim, and the defendant hasn't even challenged the substantive reasonableness of the sentence, which is within the advisory guideline range. So as a practical matter, Your Honor, I am quite confident that if this case were to be remanded for correction of that one mistake, it would have no practical effect on the overall sentencing package because there's a substantial restitution obligation, at least in our district, and I suspect in other districts as well. The sentencing courts are very careful to impose the longest possible tail or term of supervision, in part to encourage the repayment of the restitution. And in part to make sure that with a fraud artist whose activities were as extensive as Mr. Mendoza's, that we keep him on a short leash while he's on supervisory leave so that he doesn't revert to his bad habits. I would agree, Your Honor. And there's absolutely nothing in the record, nor is there anything that is based in common sense, to suggest that there would be any difference in the custodial portion of the sentence or the amount of the restitution that was ordered in the absence of an adverse finding by this court. With regard to the restitution, I gather from the court's questions that the court obviously is well aware of the position that we're taking. The only argument that I would suggest is that my colleague ignores the context in which the transaction took place. Beneficial, as the record clearly reflects, had foreclosed on the property, but the deed had not yet recorded. The Kovach family was still living in the property. Whether they had a legal or an equitable right to anything, Beneficial, per its broker, testified that the normal practice was to sell the property on the open market, to get what the market would bear, and to return any excess proceeds to the original homeowner who had been foreclosed upon. And that goes back to the dollar figures that I discussed with opposing counsel, right? Exactly, Your Honor. It goes back to the dollar figures and shows that, in fact, first off, she was a victim within the meaning of the statute which Judge Tallman parsed. Judge Seabright's factual finding that that was the case is not clearly erroneous. It's not wrong in any way. And even if it were de novo, it would not be wrong. The only thing that happened here is that the Beneficial process of selling it at fair market value and returning the proceeds was short-circuited because of the defendant's scheme, where he approached basically the Kovaches and had a side deal where they could stay in the property for a period of time, not pay rent if they would play ball with him. He approached the buyer, Alamut, and said, if you sign and use your credit, I will give you $5,000. And then he concocted deals where basically Alamut took over the debt, Kovaches lost their house, and he got the money, which was the fraud for which he was convicted. Mr. Tallman, what's your response to Ms. McMillan's argument that, with regard to the $400,000 resale by Beneficial, as I understood the record, Mr. Mendoza basically low-balled the bank with a number that was even less than $400,000. The bank countered and ultimately, as Ms. McMillan I think accurately summarized it, said to Mr. Mendoza, the resale price is $400,000, take it or leave it. That sure sounds to me like something akin to an arm's-length transaction. Well, it can't be arm's-length when it's influenced by a side deal to take everything away. I think, Your Honor, it's a transaction that Beneficial knowingly made as a business judgment in the context of someone coming to them with an offer before they even marketed the property. And by offering something that was below what turned out to be the appraised value, they, one, got back the amount of the indebtedness and, two, gave back to the Kovacs some equity that they held in the property. And in so doing, saved the time, expense, and uncertainty of marketing the property, which otherwise they would have to do. So what you're suggesting is that had Mr. Mendoza not been the repurchaser, that the bank might have actually received more on the resale of the property had they advertised it, hired a broker to market it, and so on. But that under the Hawaii statute, they would simply have had to refund the difference to Ms. Kovac, and so there wouldn't have been any financial incentive to the bank to hold out. I think that's right. Once their first lien is satisfied, the excess. And their cost of foreclosure. Exactly. So I think they made a decision that this was a good business practice on their part. It would give some equity to the buyer, Ms. Kovac, or not the buyer, the foreclosed upon party, would retain some equity in the property by virtue of the sale, and they would save the time and expense of marketing. But that, and I guess we're back to Judge Seabright, but for Mr. Mendoza being Johnny-on-the-spot with $400,000 in front of the bank, they wouldn't have done it otherwise. I think that's right, Your Honor. I'm really enjoying this argument. I'm learning a lot of new legal phrases, Johnny-on-the-spot, loop-de-loop. Loop-de-loop. But this case, frankly, to me is a bit loopy, I mean, when I look at all of the documents, so I think it's quite appropriate. Well, one of the things that I wondered, and maybe you can help me on this, did you have any evidence that came out at trial that there were people within Beneficial that were sort of in cahoots with Mr. Mendoza? Because it was hard for me in parsing through the record to figure out exactly, you know, who were the white hats and who wore the black hats. It seemed like everybody sort of was in it for a few bucks. It seemed like everybody benefited, and there was a bit of a shade of gray there. Except for people like the Kovaches, who lost their house and a whole lot of equity. That's right, Your Honor. I mean, the bottom line is, as a result of the transactions, the defendant I think either personally or through his two companies got about $430,000 and the two original homeowners lost their properties. So, I mean, that's the black on one end and the white on the other. Is it the government's position that the $400,000 sale price versus the $500,000 and some sale price was irrelevant to Beneficial because by virtue of Mr. Mendoza and his agents being involved there, had more been obtained at the sale, it would have gone back to the Kovaches and he would not have benefited. Is that correct? I think that's common sense, Your Honor. There's no direct evidence that says that, but that's clearly the logical inference from Roberson's testimony. The one thing I would point out, Your Honor, is that Ms. Roberson did say that Beneficial, one, had the practice of giving the money back, and two, in this case, they were suspicious enough about the defendant's involvement in the transaction that they explicitly directed escrow to make sure that the check was given to the Kovaches. That's transcript January 21, 2010 at pages 21 through 22, showing that they really had an intent to make sure that the equity went back to the Kovaches. And it was all to no avail because, as the Court knows, and through the supplemental excerpts of record we provided the checks, as soon as Kovach got the checks, the defendant picked her up, took her to the bank, and caused her to turn those checks into a check for him, a check for Alamut, who was a straw buyer, and one small check going to her, all part and parcel of her fraud, all part and parcel of why Judge Seabright was absolutely correct in finding that she was victimized. There are a number of other issues that were raised by the defendant. We've tried to respond to them as best we can in our brief. Unless the Court has any particular questions on those issues, I would submit. No further questions. Thank you. Thank you. The case just argued will be submitted for decision, and the Court will hear arguments in the last case of the morning, United States v. Zhang, Huang, Yi, and Zhang.
judges: O'scannlain, Tallman, Smith